# Illinois Official Reports

## Supreme Court

---

***People v. Morger*, 2019 IL 123643**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CONRAD ALLEN MORGER, Appellant. |
| Docket No. | 123643 |
| Filed | November 21, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of McLean County, the Hon. Scott D. Drazewski, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed in part and vacated in part. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender, John M. McCarthy, Deputy Defender, and Zachary A. Rosen, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant. |
| | Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Eric M. Levin, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Rebecca K. Glenberg, of Roger Baldwin Foundation, Clifford W. Berlow, and Samantha M. Glass, of Jenner & Block LLP, both of Chicago, and Esha Bhandari, of American Civil Liberties Union Foundation, of New York, New York, for *amici curiae* American Civil Liberties Union of Illinois, Inc., *et al.*

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Thomas, Kilbride, Garman, Theis, and Neville concurred in the judgment and opinion.

Chief Justice Burke took no part in the decision.

## OPINION

¶ 1    In this appeal, the defendant, Conrad Morger, challenges, as overbroad and facially unconstitutional, the probationary condition set forth in section 5-6-3(a)(8.9) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-6-3(a)(8.9) (West 2016)). Defendant submits that section's "complete ban on accessing 'social networking websites' as a condition of probation is unreasonable and unconstitutional under the First Amendment." The appellate court rejected that argument. 2018 IL App (4th) 170285. We allowed the defendant's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2013)) and now reverse, in part, the judgment of the appellate court.

¶ 2                    STATUTES PERTINENT TO DEFENDANT'S
                            SEX OFFENDER PROBATION

¶ 3    Multiple statutory conditions of probation were imposed in this case, but we consider four subsections of section 5-6-3 of the Code of Corrections (730 ILCS 5/5-6-3 (West 2016)) of particular significance in analyzing the issue presented for our consideration: *id.* § 5-6-3(a)(8.7) (*mandatory* for a child sex offender), *id.* § 5-6-3(a)(8.9) (*mandatory* if convicted of a sex offense as defined in the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2016))), 730 ILCS 5/5-6-3(a)(11) (West 2016) (*mandatory* if convicted of a sex offense as defined in SORA), and *id.* § 5-6-3(b)(18) (*discretionary* if convicted of a sex offense as defined in SORA). The pertinent conditions provide:

     "(a) The conditions of probation and of conditional discharge shall be that the person:

* * *

     (8.7) if convicted for an offense *** that would qualify the accused as a child sex offender ***, refrain from communicating with or contacting, by means of the

- 2 -

Internet, a person who is not related to the accused and whom the accused reasonably believes to be under 18 years of age; ***[1]

\* \* \*

(8.9) if convicted of a sex offense as defined in [SORA] committed on or after January 1, 2010 (the effective date of Public Act 96-262), refrain from accessing or using a social networking website as defined in Section 17-0.5 of the Criminal Code of 2012;

\* \* \*

(11) if convicted of a sex offense as defined in Section 2 of [SORA] *** may not knowingly use any computer scrub software on any computer that the sex offender uses; ***

\* \* \*

(b) The Court may in addition to other reasonable conditions relating to the nature of the offense or the rehabilitation of the defendant as determined for each defendant in the proper discretion of the Court require that the person:

\* \* \*

(18) if convicted for an offense committed on or after June 1, 2009 (the effective date of Public Act 95-983) that would qualify as a sex offense as defined in [SORA]:

   (i) not access or use a computer or any other device with Internet capability without the prior written approval of the offender's probation officer, except in connection with the offender's employment or search for employment with the prior approval of the offender's probation officer;

   (ii) submit to periodic unannounced examinations of the offender's computer or any other device with Internet capability by the offender's probation officer, a law enforcement officer, or assigned computer or information technology specialist, including the retrieval and copying of all data from the computer or device and any internal or external peripherals and removal of such information, equipment, or device to conduct a more thorough inspection;

   (iii) submit to the installation on the offender's computer or device with Internet capability, at the subject's expense, of one or more hardware or software systems to monitor the Internet use; and

   (iv) submit to any other appropriate restrictions concerning the offender's use of or access to a computer or any other device with Internet capability imposed by the offender's probation officer[.]" *Id.* § 5-6-3(a)(8.7), (a)(8.9), (a)(11), (b)(18).

The definition of a "social networking website" appears at section 17-0.5 of the Criminal Code of 2012 (720 ILCS 5/17-0.5 (West 2016)):

---

[1]Another condition of probation imposed in this case prohibited this defendant from having contact of any kind with the victim, his sister.

" 'Social networking website' means an Internet website containing profile web pages of the members of the website that include the names or nicknames of such members, photographs placed on the profile web pages by such members, or any other personal or personally identifying information about such members and links to other profile web pages on social networking websites of friends or associates of such members that can be accessed by other members or visitors to the website. A social networking website provides members of or visitors to such website the ability to leave messages or comments on the profile web page that are visible to all or some visitors to the profile web page and may also include a form of electronic mail for members of the social networking website."

¶ 4                                    BACKGROUND

¶ 5        The State's uncontested evidence, resulting in defendant's convictions, is more fully set forth in the appellate court's original opinion. See 2016 IL App (4th) 140321 (*Morger I*) (remanding for resentencing because the circuit court had delegated the responsibility of imposing conditions of probation to "Court Services"). We summarize here only those facts pertinent to our disposition.

¶ 6        In January 2013, defendant, who was 20 years old (born May 14, 1992), was charged with aggravated criminal sexual abuse and criminal sexual abuse. Each charge alleged that defendant's criminal acts—perpetrated against his teenage sister—occurred between August 2010 and November 2012. The evidence at defendant's bench trial established that defendant, while in the family residence, touched his sister's breast and vagina and that he had her touch his penis. Defendant was convicted of both charges. As the State points out, presentencing evaluation by a clinician concluded that defendant was viewed as "a moderate to high risk to reoffend," but it was "likely" that he could be safely treated in the community with appropriate supervision. The evaluator recommended, among other things, that defendant be prohibited from having contact with anyone under 18 years of age and from viewing, owning, or downloading pornography or sexually stimulating material.[2] Statutory conditions of probation referenced at the outset of this opinion implemented those recommendations. Those conditions and a host of others (18 in all) were ultimately imposed by the McLean County circuit court— after remand from the appellate court—as part of defendant's four-year sentence of probation.

¶ 7        When the case again came before the appellate court, defendant challenged multiple conditions of his probation—including the condition challenged here—all of which were upheld. 2018 IL App (4th) 170285 (*Morger II*). Defendant's constitutional challenge to the flat ban on the use of social media was premised principally, as it is now, upon the United States Supreme Court's decision in *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730 (2017). *Morger II*, 2018 IL App (4th) 170285, ¶ 69.

¶ 8        In *Packingham*, defendant, a registered sex offender who had completed his sentence, was convicted for violating a North Carolina law that barred registered sex offenders from gaining access to commercial social networking websites. The Supreme Court concluded the North

_____

[2]During an interview with a detective, in which defendant admitted his conduct and repeatedly expressed remorse, defendant acknowledged that, prior to the incidents with his sister, he had watched pornography on the Internet.

Carolina statute impermissibly restricted lawful speech in violation of the first amendment. *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737.

¶ 9    The appellate court found this case

"different from *Packingham* in two important respects: (1) defendant's access to social media is not foreclosed *altogether*, as was the case in *Packingham*, and (2) defendant has not yet completed his sentence and his probation conditions cannot 'endure for 30 years or more.' *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1734." (Emphasis in original.) *Morger II*, 2018 IL App (4th) 170285, ¶ 83.

¶ 10    With respect to the first distinction, the appellate court construed the conditions of defendant's probation so as to allow a probation officer to "temporarily *** lift or modify a condition if the probation officer believed doing so would be appropriate, given both defendant's need to have that condition temporarily lifted or modified, as well as the need to protect the public, particularly children." *Id.* ¶ 82. The appellate court believed the broad powers granted a probation officer under subsection (b)(18) of section 5-6-3—a discretionary condition of probation imposed in this case—allowed the probation officer to "lift" what, by its terms, appears to be the mandatory, unequivocal ban on access to social media imposed by subsection (a)(8.9).

¶ 11    The appellate court also found *Packingham* distinguishable because (1) defendant was still serving his sentence, unlike Packingham, and thus defendant could be subjected to restrictions that would be unconstitutional if applied to Packingham and (2) the ban on defendant's access to social media was only temporary—for the duration of his sentence—whereas the ban in *Packingham* had no temporal limitation—it was, in effect, a lifetime ban.

¶ 12    Before the appellate court, defendant argued that multiple conditions of his probation were "unconstitutional, overly broad, and unreasonable." The appellate court rejected those arguments. Before this court, he argues, on the basis of overbreadth, only one condition is unconstitutional—the "complete ban" on the use of social media.

¶ 13                                    ANALYSIS

¶ 14    As a preliminary matter, the parties have acknowledged the completion of defendant's sentence, which would render this matter moot. Nonetheless, they submit that an exception to the mootness doctrine applies.

¶ 15    Although, as a general rule, we will not decide moot questions (*In re Jarquan B.*, 2017 IL 121483, ¶ 17), this court has recognized exceptions to that rule (see *In re Alfred H.H.*, 233 Ill. 2d 345, 354-55 (2009) (discussing the public interest exception, the capable-of-repetition-yet-avoiding-review exception, and the collateral consequences exception to the mootness doctrine)). The public interest exception applies when (1) the question presented is of a public nature, (2) there is a need for an authoritative determination for the future guidance of public officers, and (3) there is a likelihood of future recurrence of the question. *In re Lance H.*, 2014 IL 114899, ¶ 13. This case meets those criteria. The issue implicates first amendment rights and access to social media websites—which the Supreme Court has characterized as "the modern public square." See *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737. The flat ban on access to those websites, by its terms, applies to *any* probationer convicted of a sex offense as defined in SORA. Hence, the question of its constitutionality will recur frequently until authoritatively resolved by this court. We thus consider the issue presented under the public

interest exception.

Principles of Review

¶ 17       The probationary condition at issue is statutory and mandatory for all probationers who are convicted of a sex offense as defined in SORA. The constitutionality of a statute is a question of law that we review *de novo*. *People v. Minnis*, 2016 IL 119563, ¶ 21. All statutes are presumed constitutional; the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity. *Id.* This court must construe the statute so as to uphold its constitutionality if reasonably possible. *Id.*

¶ 18       With respect to our probation system, specifically, this court has recognized that the State of Illinois has a legitimate interest in promoting the effective operation of its probation system, which serves the purposes of rehabilitating probationers while punishing them and protecting the public from crime. *People v. Lampitok*, 207 Ill. 2d 231, 250 (2003). The effectiveness of that system will, at times, necessarily involve limitations on constitutional rights the probationer would otherwise enjoy. As the Supreme Court observed in *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987):

> "To a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.' *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)."

¶ 19       In accord with those observations, this court, in *In re J.W.*, 204 Ill. 2d 50, 78 (2003), noted that a condition of probation that impinges on fundamental constitutional rights is not automatically deemed invalid, as even fundamental constitutional rights are not absolute and may be reasonably restricted in the public interest. When deciding the propriety of a condition of probation imposed in a particular case, whether explicitly statutory or not, the overriding concern is reasonableness. *Id.* "To be reasonable, a condition of probation must not be overly broad when viewed in the light of the desired goal or the means to that end." *Id.* The court in *J.W.* explained, in a context similar to the one now before this court: "In other words, ' "[w]here a condition of probation requires a waiver of precious constitutional rights, the condition must be narrowly drawn; to the extent it is overbroad it is not reasonably related to the compelling state interest in reformation and rehabilitation and is an unconstitutional restriction on the exercise of fundamental constitutional rights." ' " *Id.* (quoting *In re White*, 158 Cal. Rptr. 562, 565-66 (Ct. App. 1979), quoting *People v. Mason*, 488 P.2d 630, 635 (Cal. 1971)).

> "When assessing the reasonableness of a condition of probation it is appropriate to consider whether the restriction is related to the nature of the offense or the rehabilitation of the probationer. [Citations.] Other considerations are: (1) whether the condition of probation reasonably relates to the rehabilitative purpose of the legislation, (2) whether the value to the public in imposing this condition of probation manifestly outweighs the impairment to the probationer's constitutional rights, and (3) whether there are any alternative means that are less subversive to the probationer's constitutional rights, but still comport with the purposes of conferring the benefit of probation." *Id.* at 79.

¶ 20	In *J.W.*, this court concluded that a condition of probation that, for all purposes, "banished" the 12-year-old defendant from South Elgin—where he had resided with his parents and where the sex crimes were committed—was unconstitutionally overbroad as it "fail[ed] to make any provision for J.W. to enter the area for legitimate purposes." *Id.* at 81.

¶ 21	This defendant argues that the statutory prohibition on probationers accessing social media websites is facially unconstitutional as overbroad because, *inter alia*, it admits of no exceptions for legitimate purposes.

¶ 22	"A statute is overbroad on its face if it prohibits constitutionally protected activity as well as activity that may be prohibited without offending constitutional rights." *People v. Relerford*, 2017 IL 121094, ¶ 50. In order to survive intermediate scrutiny, a content-neutral regulation of protected speech—such as that at issue here—

> "(1) must serve or advance a substantial governmental interest unrelated to the suppression of free speech and (2) must not burden substantially more speech than necessary to further that interest—or in other words, it must be narrowly tailored to serve that interest without unnecessarily interfering with first amendment freedoms." *Minnis*, 2016 IL 119563, ¶ 36.

¶ 23	The overbreadth doctrine permits a party to challenge a statute as a facial violation of the first amendment, even if that party's conduct would not fall within the amendment's protection. *Relerford*, 2017 IL 121094, ¶ 50. Although in a typical facial challenge a defendant would have to establish that no set of circumstances exists under which the statute would be valid, in the first amendment context, a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *People v. Clark*, 2014 IL 115776, ¶ 11; *Minnis*, 2016 IL 119563, ¶ 44 (concluding that statute did no more than eliminate the exact source of the evil it sought to remedy); see also *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694, 698 (7th Cir. 2013) (noting that the United States Supreme Court "has invalidated bans on expressive activity that are not the substantive evil if the state had alternative means of combating the evil").

¶ 24	In this case, the statute's ban on the use of social media applies to all probationers who are convicted of a sex offense, as defined in the SORA, whether or not a minor was involved and whether or not the use of social media was a factor in the commission of the offense.

¶ 25	<center>*Packingham v. North Carolina*</center>

¶ 26	The parties recognize that the Supreme Court's decision in *Packingham* is pivotal in this case. As such, we look, in detail, at the observations and findings of the *Packingham* Court.

¶ 27	As noted, North Carolina made it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N.C. Gen. Stat. § 14-202.5(a) (2009). The statute included two express exemptions. The statutory bar did not extend to websites that "[p]rovid[e] only one of the following discrete services: photo-sharing, electronic mail, instant messenger, or chat room or message board platform." *Id.* § 14-202.5(c)(1). The law also did not encompass websites that have as their "primary purpose the facilitation of commercial transactions involving goods or services between [their] members or visitors." *Id.* § 14-202.5(c)(2); see *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1734.

¶ 28 At the outset of an opinion that would ultimately strike down the North Carolina statute, the Supreme Court repeatedly emphasized the importance of social media in modern life:

> "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 U. S. 844, 868 (1997), and social media in particular. \*\*\*
>
> Social media offers 'relatively unlimited, low-cost capacity for communication of all kinds.' *Reno*, *supra*, at 870. On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. \*\*\* In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.' *Reno*, *supra*, at 870 (internal quotation marks omitted).
>
> \*\*\*
>
> \*\*\* [T]he Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Packingham*, 582 U.S. at \_\_\_, 137 S. Ct. at 1735-36.

¶ 29 Though extolling the virtues of the Internet and social media, the Court tempered its enthusiasm with the recognition that those media of communication are subject to abuse by criminal elements:

> "For centuries now, inventions heralded as advances in human progress have been exploited by the criminal mind. New technologies, all too soon, can become instruments used to commit serious crimes. \*\*\* So it will be with the Internet and social media." *Id.* at \_\_\_, 137 S. Ct. at 1736.

¶ 30 In that regard, the Court immediately turned to a discussion of sex crimes committed against children—tacitly acknowledging that social media websites furnish a ready means for orchestrating the sexual abuse of children:

> "[A]s this Court has recognized, '[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people.' *Ashcroft v. Free Speech Coalition*, 535 U. S. 234, 244 (2002). And it is clear that a legislature 'may pass valid laws to protect children' and other victims of sexual assault 'from abuse.' See *id.*, at 245; accord, *New York v. Ferber*, 458 U. S. 747, 757 (1982). The government, of course, need not simply stand by and allow these evils to occur. But the assertion of a valid governmental interest 'cannot, in every context, be insulated from all constitutional protections.' *Stanley v. Georgia*, 394 U. S. 557, 563 (1969)." *Id.* at \_\_\_, 137 S. Ct. at 1736.

¶ 31 En route to resolving the issue before the Court—applying intermediate scrutiny to a statute it assumed was content-neutral—the Supreme Court made two further assumptions: (1) the scope of the statute applied to commonplace social networking sites like Facebook, LinkedIn, and Twitter, and (2) the first amendment permits a state to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that presages a sex crime, like contacting a minor or using a website to gather information about a minor. The Court emphasized: "Specific laws of that type must be the State's first resort to ward off the serious

harm that sexual crimes inflict." *Id.* at \_\_\_, 137 S. Ct. at 1737. The Court then cryptically added in *dictum*: "(Of importance, the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is also not an issue before the Court.)" *Id.* at \_\_\_, 137 S. Ct. at 1737.[3]

¶ 32 That said, the Court determined that the statute was not narrowly tailored to serve a significant governmental interest. *Id.* at \_\_\_, 137 S. Ct. at 1736-37.

> "Even with these assumptions about the scope of the law and the State's interest, the statute here enacts a prohibition unprecedented in the scope of First Amendment speech it burdens. *** By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id.* at \_\_\_, 137 S. Ct. at 1737.

¶ 33 The Court concluded:

> "In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives." *Id.* at \_\_\_, 137 S. Ct. at 1737.

¶ 34 The interpretation of those last two sentences carries momentous weight in our resolution of this case. In the wake of *Packingham*, federal decisions following the Court's decision have tended to focus only on the first of those two, emphasizing the Court's reference to "persons who have completed their sentences," as a limitation of the Court's holding.

¶ 35 <center>Federal Court of Appeals Decisions</center>

¶ 36 Federal decisions reviewing the propriety of conditions of supervised release deal with the same concerns that we consider relevant when imposing conditions of probation: deterrence of crime, protection of the public, and rehabilitation.[4]

¶ 37 Some federal decisions prior to *Packingham*, such as *United States v. Burroughs*, 613 F.3d 233, 244-45 (D.C. Cir. 2010), held that, where a defendant sex offender did not use a computer to facilitate his crimes, the imposition of unexplained conditions restricting his use of a

---

[3]The comment, perhaps, expresses the Court's concern over the proliferation of statutes that govern the lives of sex offenders who have served their sentences, circumscribing myriad aspects of their lives.

[4]Section 3583(d)(1) of Title 18 requires that discretionary conditions of supervised release be "reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)." 18 U.S.C. § 3583(d)(1) (2000). Those factors are "the nature and circumstances of the offense and the history and characteristics of the defendant"; the need "to afford adequate deterrence to criminal conduct"; the need "to protect the public from further crimes of the defendant"; and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(1), (a)(2)(B), (C), (D).

computer, while on supervised release, constitutes error. Compare *United States v. Albertson*, 645 F.3d 191, 198 (3d Cir. 2011) (ban on Internet use unless preapproved by probation is "too broad unless the defendant has used the internet as an instrument of harm"), with *United States v. Legg*, 713 F.3d 1129 (D.C. Cir. 2013), and *United States v. Laureys*, 653 F.3d 27 (D.C. Cir. 2011) (cases in which the Internet *was* used to commit the crimes). The *Burroughs* court noted, *inter alia*:

> "The government argues that these restrictions are related to Burroughs's conduct because the Internet can be used to arrange sexual encounters with minors and to advertise minors for prostitution. Of course it can. But from drug dealers to Ponzi schemers and smugglers to stalkers—nearly any criminal can use the Internet to facilitate illegal conduct. That an offense is sometimes committed with the help of a computer does not mean that the district court can restrict the Internet access of anyone convicted of that offense." *Burroughs*, 613 F.3d at 243.

¶ 38    In *United States v. Perazza-Mercado*, 553 F.3d 65 (1st Cir. 2009), the court of appeals considered a flat ban on home use of the Internet as a condition of supervised release. The court recognized:

> "[O]ur sister circuits have upheld broad restrictions on internet access as a condition of supervised release where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." *Id.* at 70.

The court noted, however,

> "Conversely, in cases where there is an insufficient nexus with a defendant's conduct or characteristics, courts have vacated supervised release conditions restricting internet access. For example, in *United States v. Freeman*, 316 F.3d 386 (3d Cir. 2003), 'there [was] nothing in t[he] record to suggest that [defendant] ha[d] used the internet to contact young children' or solicit inappropriate sexual contact. *Id.* at 392. Accordingly, the court found that a restriction forbidding defendant from owning a computer or accessing the internet without the approval of his probation officer was 'overly broad.' *Id.*" *Id.* at 71.

¶ 39    One might think that *Packingham*'s effusive description of social media websites as "the modern public square," for purposes of the first amendment, would result in an extension of *Burroughs*'s principles with respect to sex offenders—on supervised release or probation—who have not used the Internet to commit their crimes. However, as the State notes, many post-*Packingham* cases have limited the reach of *Packingham*, a recent case noting that "*Packingham* invalidated only a *post*-custodial restriction and expressed concern that the statute applied even to persons who have already served their sentence." (Emphasis in original and internal quotation marks omitted.) *United States v. Carson*, 924 F.3d 467, 473 (8th Cir. 2019).

> "Because supervised release is part of a defendant's sentence, *Packingham* does not render a district court's restriction on access to the internet during a term of supervised release plain error. [Citations.] We find this reasoning applies with equal force here. Thus, even assuming the district court's prohibition on creating or maintaining a social media profile implicates the same First Amendment interests as a restriction on

*accessing* social media altogether, the district court did not commit plain error by imposing Special Condition 16." (Emphasis in original.) *Id.*

It appears, in all of the cases cited in this paragraph of *Carson*, use of the Internet was somehow involved in the commission of the offenses. However, the dispositive point emphasized was that those defendants—subject to the prohibitory conditions—were *still serving their sentences*.

¶ 40    At least one post-*Packingham* case has emphasized the need for narrow tailoring and consistency of conditions of supervised release. See *United States v. Holena*, 906 F.3d 288 (3d Cir. 2018). Holena repeatedly visited an online chatroom and tried to entice a 14-year-old boy to have sex. As it turned out, the "boy" was an FBI agent. Holena pled guilty to attempting to entice a minor to engage in sexual acts. He was sentenced to 10 years' imprisonment and a lifetime of supervised release. As a special condition of that supervised release, he was forbidden to use the Internet without his probation officer's approval. He had to submit to regular searches of his computer and home, and he had to let the probation office install monitoring and filtering software on his computer. *Id.* at 290.

¶ 41    After serving his prison sentence, Holena violated the terms of his supervised release on two occasions. The first time, he went online to update social media profiles and answer e-mails. The second time, he logged into Facebook without approval, then lied about it to his probation officer. After each violation, the court sentenced him to nine more months' imprisonment and reimposed the special conditions. At Holena's latest revocation hearing, the judge imposed another condition, forbidding him to possess or use any computers, electronic communications devices, or electronic storage devices. Holena objected to that lifetime ban. *Id.*

¶ 42    The court of appeals found the conditions imposed upon Holena to be impermissibly contradictory and more restrictive than necessary. *Id.* at 291. In the latter respect, as the court was remanding to the district court for tailoring of conditions, the court offered this guidance:

"The District Court can limit Holena's First Amendment rights with appropriately tailored conditions of supervised release. Defendants on supervised release enjoy less freedom than those who have finished serving their sentences. *See United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); *United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017). But, as we have noted, these restrictions must be tailored to deterring crime, protecting the public, or rehabilitating the defendant. Under *Packingham*, blanket internet restrictions will rarely be tailored enough to pass constitutional muster." *Id.* at 294-95.

¶ 43                    Subsection (a)(8.9)'s Ban on the Use of Social Media

¶ 44    Turning to the specific statutory condition here at issue—subsection (a)(8.9) of section 5-6-3—we reject, at the outset, the suggestion of the appellate court that a probation officer could "temporarily *** lift or modify" the statute's ban on access to, or use of, social media. See *Morger II*, 2018 IL App (4th) 170285, ¶ 82. The State now concedes that is not the case.[5]

---

[5] In a footnote at page six of the State's brief, the State acknowledges: "The appellate court appears to have conflated the probation condition that permitted defendant to use a computer or other Internet-connected device with his probation officer's approval, *** with the condition prohibiting defendant

Subsection (b)(18) of section 5-6-3—a discretionary condition of probation that was imposed in this case—provides for extensive monitoring of a defendant's devices "with Internet capability." In fact, an offender cannot—without violating that condition of probation—access or use a device "with Internet capability"—*anyone's* device—without the prior approval of his or her probation officer. However, subsection (b)(18) does not specifically address what Internet sites a defendant may visit.[6] Moreover, it does not allow a probation officer to authorize an offender's access to sites—in this instance a whole category of sites—that the legislature has chosen to restrict. Hence, we reject the appellate court's conclusion that a probation officer may "lift" subsection (a)(8.9)'s mandatory, flat ban on the use of social media.

¶ 45 With that clarification, we examine the constitutionality of the statute using the lens of intermediate scrutiny—and the standard of review *is* intermediate scrutiny. Like the statute at issue in *Minnis*—where we found the statute to be content-neutral and applied intermediate scrutiny—this "provision is part of a statutory scheme intended to prevent sex offenses against children and to protect the public." *Minnis*, 2016 IL 119563, ¶ 34. We note, as well, that the Supreme Court in *Packingham*, considering a flat ban on the use of social media with some similarities to the one now before us, proceeded on the basis that the statute was content-neutral and "subject to intermediate scrutiny." *Packingham*, 582 U.S. at ___, 134 S. Ct. at 1736. In *Packingham*, the Supreme Court noted—as did this court in *Minnis*—that in order to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest; it must not burden substantially more speech than is necessary to further the government's legitimate interests. *Id.* at ___, 134 S. Ct. at 1736; *Minnis*, 2016 IL 119563, ¶ 34.

¶ 46 The requirement of narrow tailoring dovetails, for purposes of our review, with standards for imposing probationary conditions that impinge upon constitutional rights. As *J.W.* instructs,

> "[w]here a condition of probation requires a waiver of precious constitutional rights, the condition must be narrowly drawn; to the extent it is overbroad, it is not reasonably related to the compelling state's interest in reformation and rehabilitation and is an unconstitutional restriction on the exercise of fundamental constitutional rights." (Internal quotation marks omitted.) *J.W.*, 204 Ill. 2d at 78.

In the end, the geographical restriction challenged in *J.W.* failed to pass constitutional muster because it failed to make an exemption from the restriction for legitimate purposes; *i.e.*, it was not "narrowly drawn." *Id.* at 81-82.

¶ 47 Considerations identified in *J.W.* as bearing upon the question of whether a condition of probation, impinging upon constitutional rights, is reasonably related to the goals of probation and, thus, narrowly drawn and not overbroad, include (1) the nature of the offense, (2) the rehabilitation of the defendant, (3) whether the condition of probation reasonably relates to the rehabilitative purpose of the legislation, (4) whether the value to the public in imposing the condition of probation manifestly outweighs the impairment to the probationer's constitutional

---

from using or accessing social networking websites, which allowed for no override by the probation officer."

[6]We also observe, because it is *discretionary*, it may not apply in every case where the imposition of subsection (a)(8.9) is required.

rights, and (5) whether there are any alternative means that are less subversive to the probationer's constitutional rights but still comport with the purposes of conferring the benefit of probation. *Id.* at 79. The last consideration necessarily requires that we take into account other conditions of probation that were available for utilization and/or were, in fact, imposed.

¶ 48    We begin with the nature of the sexual offenses committed by defendant. The first act was committed while defendant was still a teenager. The offenses involved sexual conduct in the family home with a younger sibling, who was also a teenager. The offenses were, in a sense, crimes of opportunity and convenience. It does not appear that defendant sought victims over the Internet[7] or, more generally, in the community or world at large. There is nothing to suggest that defendant was a sexual predator who would use the Internet to find and molest children.

¶ 49    As far as his prospects for rehabilitation are concerned, we have only the assessment of the evaluator, who concluded that defendant was viewed as "a moderate to high risk to reoffend" but it was "likely" that he could be safely treated in the community with appropriate supervision. In furtherance of that treatment, the evaluator recommended, *inter alia*, that defendant be prohibited from having contact with anyone under 18 years of age and from viewing, owning, or downloading pornography or sexually stimulating material. Conditions of probation implementing *both* of those recommendations were included in the circuit court's order of probation.

¶ 50    Next is the broader question: whether the contested condition of probation—here a total ban on access to social media applicable to *all* sex offenders—reasonably relates to the rehabilitative purpose of the legislation. During oral argument of this case, the State was asked to explain how the total ban on access to social media would contribute to a defendant's rehabilitation. After some circuitous, nonresponsive references to protection of the public, the answer was that the ban would remove the "temptation to reoffend." That answer *might* carry some weight where a defendant is one who has used social media to orchestrate and ultimately commit his crimes;[8] however, a host of offenders—this defendant included—do not fall into that category. Subsection (a)(8.9) broadly sweeps the latter in with offenders who *have* used social media to prey upon others.[9]

¶ 51    Moreover, we find an observation in *Packingham* relevant in this context. The Court, in *Packingham*, concluded,

> "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. Even convicted criminals—and in some instances especially convicted criminals—*might receive legitimate benefits from these means for access to the world*

---

[7]The Internet was, however, a factor insofar as defendant viewed pornography over the Internet immediately before the acts of sexual conduct occurred.

[8]It would seem that counseling and treatment would more likely ensure successful rehabilitation, as opposed to a mere temporary ban on the use of social media.

[9]As noted in a recent law review article, some states—Illinois included—do not give judges and supervising officers the option of declining to impose restrictions on access to social media. See Jacob Hutt, *Offline: Challenging Internet and Social Media Bans for Individuals on Supervision for Sex Offenses*, 43 N.Y.U. Rev. L. & Soc. Change 663, 665 (2019).

*of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives.*" (Emphasis added.) *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737.

¶ 52    Federal courts limiting the reach of *Packingham* have focused on the second sentence of this paragraph—particularly the phrase, "even by persons who have completed their sentences"—to find that the principles of *Packingham* do not apply to those still serving their sentences—a group the *Packingham* Court had no reason to address. Those courts ignore the last sentence—italicized *supra*—which refers to the reformative and rehabilitative aspects of access to social media.

¶ 53    However, those who are still serving their sentences are also "convicted criminals" who "might receive legitimate benefits" from social media as "they seek to reform and to pursue lawful and rewarding lives." *Id.* at ___, 137 S. Ct. at 1737 One has to ask how "reform" differs from "rehabilitation" and, if there is no difference, why foreclosure of access to social media *inhibited* a sex offender's "reform" and was unconstitutional, in *Packingham*, but subsection (a)(8.9)'s total ban on access for *all* sex offenders on probation *furthers* the goal of "rehabilitation," without "tailoring" as to substance or circumstance.[10]

¶ 54    To be sure, moving on to consider the next factor identified in *J.W.*—"whether the value to the public in imposing this condition of probation manifestly outweighs the impairment to the probationer's constitutional rights"—the ban of subsection (a)(8.9) protects the public from those offenders who *would* use social media for unlawful purposes. The ban in *Packingham* sought to further the same end. Yet, assuming that the North Carolina law applied to social networking sites such as "Facebook, LinkedIn, and Twitter"—sites that would fall within the purview of subsection (a)(8.9) as well—the Supreme Court found the law could not stand because it was not narrowly tailored to serve that significant governmental interest. See *id.* at ___, 137 S. Ct. at 1736-37. The broad ban of the law could not be sustained solely on the ground that it protected the public against sex offenders, though it undoubtedly did that. It unconstitutionally impaired the first amendment rights of convicted sex offenders. In this case, we find that the protective value of the social media ban, in its current, absolute form, does not manifestly outweigh the impairment to the probationer's constitutional rights.

¶ 55    That is particularly so when we consider the final *J.W.* factor: whether there are any alternative means that are less subversive to the probationer's constitutional rights but still comport with the purposes of conferring the benefit of probation. There obviously are. They were additional conditions of probation imposed in this very case.

¶ 56    If the concern is that defendant might contact other minors via the Internet for sexual purposes, the mandatory condition of probation set forth in subsection (a)(8.7) of section 5-6-3 specifically prohibited defendant from doing so. Moreover, the discretionary condition of probation imposed pursuant to subsection (b)(18) of section 5-6-3 grants a defendant's probation officer broad oversight of the defendant's access to, or use of, any device with

---

[10]As one commentator has observed, in conjunction with a discussion of *Packingham*:

"The irony of these restrictions lies in the supposedly rehabilitative and reintegrative purposes underlying supervision: the very technology that supervised individuals could use to seek out employment, to reconnect with estranged family members, to become engaged in politics, and to stay informed on current events is prohibited. The ends of parole—'to help individuals reintegrate into society as constructive individuals as soon as they are able'—are obstructed by its means." Hutt, *supra* at 665-66.

- 14 -

Internet capability, including (1) preliminary approval of use, (2) unannounced examinations of devices with Internet capability, (3) the right to install "hardware or software systems" on a defendant's devices to monitor Internet use, and (4) the power to impose "any other appropriate restrictions concerning the offender's use of or access to a *** device with Internet capability." As if that were not enough, the mandatory condition imposed pursuant to subsection (a)(11) of section 5-6-3 prohibits, for good measure, a probationer convicted of a sex offense from knowingly using computer scrub software.

¶ 57    Defendant does not, before this court, challenge the constitutionality of any of those provisions. They provide ready examples of how the conditions of defendant's probation could be "narrowly drawn" so as to not function as an "unconstitutional restriction on the exercise of fundamental constitutional rights." (Internal quotation marks omitted.) See *J.W.*, 204 Ill. 2d at 78. Defendant could not contact a minor via the Internet without violating a specific condition of his probation—condition No. 7 (730 ILCS 5/5-6-3(a)(8.7) (West 2016)). Pursuant to condition No. 8 (*id.* § 5-6-3(b)(18)), he could not—without violating his probation—even access or use a device with Internet capability without the prior approval of his probation officer. That condition mandates prospective and retrospective scrutiny of everything defendant would do, or did, on the Internet.

¶ 58    Having considered the factors this court identified as relevant in *J.W.*, we conclude that the probationary condition set forth in subsection (a)(8.9) of section 5-6-3 of the Code of Corrections is overbroad and facially unconstitutional. Like the geographic ban in *J.W.*, the social media ban is absolute, admitting of no exceptions for legitimate use (see *J.W.*, 204 Ill. 2d at 81), which could be supervised and overseen by a defendant's probation officer.[11] Applying the tenets of *Packingham*, we find that subsection (a)(8.9), in its current form, "prohibits constitutionally protected activity as well as activity that may be prohibited without offending constitutional rights." *Relerford*, 2017 IL 121094, ¶ 50. "[A] substantial number of its applications are unconstitutional, judged in relation to the statute's legitimate sweep" (*Clark*, 2014 IL 115776, ¶ 11), which *is* the protection of the public.[12] The condition of probation is not narrowly drawn, as *J.W.* requires. See *J.W.*, 204 Ill. 2d at 78. It unnecessarily sweeps within its purview those who never used the Internet—much less social media—to commit their offenses and who show no propensity to do so, as well as those whose Internet activities can be supervised and monitored by less restrictive means.

¶ 59    For the reasons stated, we find probationary condition No. 5, imposed pursuant to subsection (a)(8.9) of section 5-6-3 of the Code of Corrections, unconstitutionally overbroad. We express no opinion as to the constitutionality of other conditions of probation imposed in this case, as they are not challenged in this court. Consequently, we reverse, in part, the judgment of the appellate court and vacate the probationary condition banning access to, or use of, social media. We otherwise affirm the appellate court's judgment as to issues not before

---

[11]We assume, for purposes of this analysis only, that subsection (b)(18) of section 5-6-3 is constitutional, as defendant is not challenging its constitutionality in this court.

[12]As noted *supra*, we are not persuaded that subsection (a)(8.9) provides rehabilitative value—according to the State, the removal of temptation to reoffend—that outweighs, in many circumstances, its detriment to rehabilitation, given the Supreme Court's statements regarding the positive value of social media in a sex offender's reformation.

us.

¶ 60        Appellate court judgment affirmed in part and reversed in part.

¶ 61        Circuit court judgment affirmed in part and vacated in part.

¶ 62        CHIEF JUSTICE BURKE took no part in the consideration or decision of this case.