2021 IL App (4th) 180142

NO. 4-18-0142

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| JONATHAN R. GALLEY, | ) | No. 17CF14 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Presiding Justice Knecht concurred in the judgment and opinion.
Justice Turner dissented, with opinion.

**OPINION**

¶ 1     In January 2017, the State charged defendant, Jonathan R. Galley, with four counts of predatory criminal sexual assault of a child, Class X felonies (720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2016)), and six counts of aggravated criminal sexual abuse, Class 2 felonies (720 ILCS 5/11-1.60(c)(1)(i), (g) (West 2016)). Following a bench trial, defendant was found guilty on 6 of the 10 counts: 4 counts of predatory criminal sexual assault of a child less than 13 years old and 2 counts of aggravated criminal sexual abuse of a victim less than 13 years old. The trial court sentenced defendant to 37 years in the Illinois Department of Corrections (DOC) followed by an indeterminate period (3 years to life) of mandatory supervised release (MSR), and it informed defendant he must register as a sex offender. Defendant's MSR conditions included a total prohibition on accessing social networking websites (730 ILCS 5/3-3-7(a)(7.12) (West 2016)).

¶ 2    On appeal, defendant argues the Illinois Supreme Court's decision in *People v. Morger*, 2019 IL 123643, __ N.E.3d __ , renders "the blanket statutory prohibition on use of social media as [an MSR] condition *** unconstitutional on its face under the First Amendment." We agree.

¶ 3                              I. BACKGROUND

¶ 4    In January 2017, the State charged defendant by way of a 10-count information alleging he sexually abused his girlfriend's 11-year-old granddaughter multiple times between October 1 and December 19, 2016. The State charged defendant with four counts of predatory criminal sexual assault of a child under the age of 13 (720 ILCS 5/11-1.40(a)(1) (West 2016)) and six counts of aggravated criminal sexual abuse of a child under the age of 13 (720 ILCS 5/11-1.60(c)(1)(i) (West 2016)). The matter proceeded to a bench trial, where the trial court found defendant guilty and entered judgment on the four predatory sexual assault of a child counts and two of the aggravated criminal sexual abuse of a child counts. The court sentenced defendant to 37 years in DOC followed by MSR for an indeterminate period ranging from 3 years to life.

¶ 5    Defendant's MSR terms included the following mandatory provision from subsection (a)(7.12) of the Unified Code of Corrections:

> "The conditions of parole or mandatory supervised release shall be such as the Prisoner Review Board deems necessary to assist the subject in leading a law-abiding life. The conditions of every parole and mandatory supervised release are that the subject:
>
>                              * * *
>
> (7.12) if convicted of a sex offense as defined in the Sex Offender Registration Act committed on

- 2 -

> or after January 1, 2010 (the effective date of Public Act 96-262), *refrain from accessing or using a social networking website as defined in Section 17-0.5 of the Criminal Code of 2012*[.]" (Emphasis added.) 730 ILCS 5/3-3-7(a)(7.12) (West 2016).

Illinois law further provides:

> " 'Social networking website' means an Internet website containing profile web pages of the members of the website that include the names or nicknames of such members, photographs placed on the profile web pages by such members, or any other personal or personally identifying information about such members and links to other profile web pages on social networking websites of friends or associates of such members that can be accessed by other members or visitors to the website. A social networking website provides members of or visitors to such website the ability to leave messages or comments on the profile web page that are visible to all or some visitors to the profile web page and may also include a form of electronic mail for members of the social networking website." 720 ILCS 5/17-0.5 (West 2016).

¶ 6    Defendant filed a motion to reconsider, alleging two trial errors and an excessive sentence. The trial court denied the motion following a hearing.

¶ 7    This appeal followed.

¶ 8                                    II. ANALYSIS

¶ 9          Relying upon the Illinois Supreme Court's decision in *Morger*, defendant challenges as overbroad and facially unconstitutional one statutory MSR condition—prohibiting accessing or using social networking websites. The State concedes the argument and echoes defendant's claim that subsection (a)(7.12) of the Unified Code of Corrections (730 ILCS 5/3-3-7(a)(7.12) (West 2016)) is unconstitutional on its face by overburdening first amendment rights. Heeding the parties' arguments and, more importantly, following guidance from our supreme court, we agree the statute is unconstitutional.

¶ 10         A challenge to the constitutionality of a statute presents a legal question we review *de novo*. *People v. Minnis*, 2016 IL 119563, ¶ 21, 67 N.E.3d 272. Since we presume statutes are constitutional, the "party challenging the constitutionality of a statute [bears] the burden of establishing its invalidity." *In re J.W.*, 204 Ill. 2d 50, 62, 787 N.E.2d 747, 754 (2003).

¶ 11         "First amendment protections for speech extend fully to communications made through the medium of the Internet," meaning laws curtailing Internet speech must pass constitutional muster. *Minnis*, 2016 IL 119563, ¶ 23. Here, we consider a statute prohibiting a person on MSR from accessing or using social networking websites, which defendant challenges as overbroad and facially unconstitutional. "According to [the] First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). Specifically, "a law may be invalidated as overbroad only if a substantial number of its applications to protected speech are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Minnis*, 2016 IL 119563, ¶ 24.

¶ 12         Besides being overbroad, a statute imposing a content-neutral restriction on Internet speech can be unconstitutional if it fails intermediate scrutiny. A restriction on speech is

content-neutral if it limits speech regardless of what the speech is about, *i.e.*, the ideas or views expressed. See *Minnis*, 2016 IL 119563, ¶ 33. To withstand intermediate scrutiny, the statute's content-neutral restriction on speech must clear two hurdles:

> "(1) [it] must serve or advance a substantial governmental interest unrelated to the suppression of free speech and (2) [it] must not burden substantially more speech than necessary to further that interest—or in other words, it must be narrowly tailored to serve that interest without unnecessarily interfering with first amendment freedoms." *Minnis*, 2016 IL 119563, ¶ 36.

The parties direct our attention to *Morger*, believing first it provides the template for our analysis and, second, it directs the outcome of this case.

¶ 13                                          A. *People v. Morger*

¶ 14            In *Morger*, our supreme court recently applied these two tests, overbreadth and intermediate scrutiny, when evaluating facial challenges to a statutory probation provision that is nearly identical to this statutory MSR term. There, the court considered the following statute:

> "The conditions of probation and of conditional discharge shall be that the person:
>
> * * *
>
> (8.9) if convicted of a sex offense as defined in the Sex Offender Registration Act committed on or after January 1, 2010 (the effective date of Public Act 96-262), *refrain from accessing or using a social networking website as defined in Section 17-0.5 of*

*the Criminal Code of 2012*[.]" (Emphasis added.)

730 ILCS 5/5-6-3(a)(8.9) (West 2016).

As one may note, this italicized language mirrors that of the statute at issue in this case.

¶ 15          As part of its carefully reasoned analysis, the *Morger* court concluded the above statute " 'is part of a statutory scheme intended to prevent sex offenses against children and to protect the public,' " suggesting the statute served a substantial governmental interest or had a plainly legitimate sweep. *Morger*, 2019 IL 123643, ¶ 45 (quoting *Minnis*, 2016 IL 119563, ¶ 34). Nevertheless, the court found the above-cited statutory probation condition "overbroad and facially unconstitutional" because "in its current form" the statute " 'prohibits constitutionally protected activity as well as activity that may be prohibited without offending constitutional rights.' " *Morger*, 2019 IL 123643, ¶ 58 (quoting *People v. Relerford*, 2017 IL 121094, ¶ 50, 104 N.E.3d 341). As part of the intermediate-scrutiny analysis, the court found no narrow tailoring, explaining the probation condition "unnecessarily sweeps within its purview those who never used the Internet—much less social media—to commit their offenses and who show no propensity to do so, as well as those whose Internet activities can be supervised and monitored by less restrictive means." *Morger*, 2019 IL 123643, ¶ 58. Concerning overbreadth, the court similarly concluded: " '[A] substantial number of its applications are unconstitutional, judged in relation to the statute's legitimate sweep' [citation], which *is* protection of the public." (Emphasis in original.) *Morger*, 2019 IL 123643, ¶ 58 (quoting *People v. Clark*, 2014 IL 115776, ¶ 11, 6 N.E.3d 154).

¶ 16          Defendant argues: "*Morger* direct[s] the result in this case: a ban on accessing social media for the duration of MSR—which can last as long as natural life—is just as unconstitutional as a ban for the duration of a sex offender registration or probation." The State likewise maintains: "Our supreme court's holding in *People v. Morger*, reviewing the same

condition in an analogous constitutional context, directly answers the question of whether the MSR condition banning defendant from accessing 'social media websites' is unconstitutionally overbroad and not narrowly tailored." We certainly appreciate the supreme court's comprehensive analysis, and of course, we are bound by its decision when it controls a case under our review. See *Doyle v. Hood*, 2018 IL App (2d) 171041, ¶ 35, 112 N.E.3d 1040. But the *Morger* court made clear its opinion applied to only the specific probation provision found at "subsection (a)(8.9) of section 5-6-3 of the Code of Corrections." *Morger*, 2019 IL 123643, ¶ 59. The court declined to speak in broad or sweeping terms. So even though *Morger* and this case consider nearly identical statutory provisions—each mandating a person, "if convicted of a sex offense as defined in the Sex Offender Registration Act committed on or after January 1, 2010 ***, refrain from accessing or using a social networking website as defined in Section 17-0.5 of the Criminal Code of 2012" (730 ILCS 5/5-6-3(a)(8.9), 3-3-7(a)(7.12) (West 2016))—we cannot mechanically apply *Morger*'s holding to this MSR provision. Instead, we must plumb *Morger*'s rationale for signs of whether these two statutory bans on social media should meet the same fate.

¶ 17        B. *Morger* and *Packingham* Emphasize the Importance of Internet Speech

¶ 18        Digging deeper into *Morger*, we find a heavy emphasis on the reformative and rehabilitative potential for a probationer using social networking websites. In arriving at its holding, our supreme court parsed the United States Supreme Court's opinion in *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730 (2017), observing "the Supreme Court repeatedly emphasized the importance of social media in modern life." *Morger*, 2019 IL 123643, ¶ 28.

¶ 19        In *Packingham*, the Supreme Court considered a law "mak[ing] it a felony for a registered sex offender 'to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal

Web pages.' " *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1733 (quoting N.C. Gen. Stat. Ann. § 14-202.5(a), (e) (2015)). The Court noted the Internet, and social media specifically, represents a twenty-first century quintessential public forum where people "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.' " *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1735-36. The *Packingham* Court concluded the challenged law failed intermediate scrutiny because it was not narrowly tailored, even describing the content-neutral statute as "a prohibition unprecedented in the scope of First Amendment speech it burdens." *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737-38. The Court explained: "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737.

¶ 20        Although *Packingham* did not address the exact issue here—it considered social media restrictions for sex offenders who completed their sentences, not social media restrictions for sex offenders still serving sentences on probation—our supreme court relied heavily upon it in *Morger*. For example, our supreme court twice quoted the following paragraph from *Packingham*:

> " 'In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. Even convicted criminals—and in some instances especially convicted criminals—*might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives*.' "

(Emphasis added.) *Morger*, 2019 IL 123643, ¶¶ 33, (quoting *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737).

Our supreme court not only judged this passage "relevant in this context" of probation (*Morger*, 2019 IL 123643, ¶ 51) but said it "carrie[d] *momentous weight* in our resolution of this case." (Emphasis added.) *Morger*, 2019 IL 123643, ¶ 34. Signaling its importance, our supreme court used this passage to distinguish *Morger* from other cases that had either considered this issue or applied *Packingham*. For example, some federal circuit courts of appeal tried limiting the reach of *Packingham* to those no longer on probation or parole by emphasizing the phrase "even by persons who have completed their sentences" (*Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737), but the *Morger* court did not follow that path. Rather, believing the federal courts unduly ignored part of the above passage, *Morger* went the opposite direction and extended *Packingham*'s reach to probationers. The supreme court determined the reasoning in the above passage, especially the italicized portion, applied to the facts and issue before it. Specifically, the court believed probationers, like Morger, "who are still serving their sentences are also 'convicted criminals' [and] 'might receive legitimate benefits' from social media as 'they seek to reform and to pursue lawful and rewarding lives.' " *Morger*, 2019 IL 123643, ¶ 53 (quoting *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1737). Since probationers could use social media for a wide variety of legitimate purposes like communicating with employers or family or the community at large as part of reformation and rehabilitation, the supreme court held the statute overbroad and facially unconstitutional because the blanket ban on accessing or using social networking websites went too far by prohibiting a substantial amount of constitutionally protected speech as well as prohibiting these probationers from using social media for ill. *Morger*, 2019 IL 123643, ¶ 58.

¶ 21        *Morger*'s extension of *Packingham* to probationers is telling. Unlike those federal courts that focused on the defendant's status, our supreme court focused more on the benefits of social media to convicted criminals—including those still serving their sentences. We interpret this as the Illinois Supreme Court emphasizing the reformative and rehabilitative aspects of social media over a defendant's status. We see no reason why that emphasis would not carry over to persons on MSR, who (like probationers) are also trying to reintegrate back into society with conditional liberty. See *Round v. Lamb*, 2017 IL 122271, ¶ 21, 90 N.E.3d 432.

¶ 22        Another important feature in *Morger*'s rationale comes from its review of federal cases. On the road to finding the statutory probation condition unconstitutional, our supreme court analyzed several federal cases that found conditions of supervised release regulating defendants' Internet use violated the first amendment. *Morger*, 2019 IL 123643, ¶¶ 36-38, 40-42 (discussing federal court of appeals decisions). The court acknowledged the federal cases differed from the *Morger* case because they considered supervised release, not probation; however, the court opined those federal cases "deal with the same concerns that we consider relevant" here. *Morger*, 2019 IL 123643, ¶ 36. As we read it, we do not see anywhere in the discussion where the supreme court noted if or how the context of supervised release, as opposed to probation, affected its analysis or outcome. At one point, the court referenced "supervised release or probation" when discussing the potential reach of *Packingham* and other cases. *Morger*, 2019 IL 123643, ¶ 39. The upshot for our discussion is that, even though the *Morger* court limited its holding to the one statutory probation condition (subsection (a)(8.9) of section 5-6-3 of the Unified Code of Corrections), its analysis and reasoning drew heavily from cases considering supervised release provisions. Although that approach resonates here, we are obligated to look closely at MSR and probation to ascertain

whether the two punishments differ enough to allow the State to impose blanket social networking website bans on persons on MSR without offending the first amendment.

¶ 23                          C. Probation and MSR

¶ 24         Probation and MSR represent two different points on "the 'continuum' of state-imposed punishments," with MSR sitting closer to imprisonment on that scale. *People v. Wilson*, 228 Ill. 2d 35, 43-44, 885 N.E.2d 1033, 1039 (2008) (quoting *Samson v. California*, 547 U.S. 843, 850 (2006)). For instance, Illinois's Unified Code of Corrections provides that felony sentences of imprisonment in DOC must include an MSR term (730 ILCS 5/5-8-1(d) (West 2016)) and, furthermore, "a prisoner on [MSR] remains in" DOC's custody during that term (*Newsome v. Hughes*, 131 Ill. App. 3d 872, 875, 476 N.E.2d 478, 481 (1985)). Probation, by contrast, represents a discretionary " 'mild and ambulatory' punishment" for offenders who "do[ ] not present a threat to the safety and security of a community." *People v. Moss*, 217 Ill. 2d 511, 522, 842 N.E.2d 699, 707 (2005). Given that Illinois law requires MSR but not probation, it is plain "[o]ur sentencing scheme thus contemplates that an offender on MSR presents a greater threat to the public than a probationer." *Moss*, 217 Ill. 2d at 522.

¶ 25         Although probation and MSR occupy two different points on the punishment spectrum, "[p]robationers and persons on MSR are similarly situated in the broad sense that both enjoy conditional liberty." *Moss*, 217 Ill. 2d at 522. They are granted conditional liberty for purposes of rehabilitating past criminal behavior while reintegrating into society as law-abiding citizens. See *United States v. Knights*, 534 U.S. 112, 120-21 (2001) (stating a defendant who "successfully complete[s] probation [can] be integrated back into the community"); *Lamb*, 2017 IL 122271, ¶ 21 ("Mandatory supervised release is designed to facilitate reintegration back into society ***."). Whether it is this shared purpose or some other reason, their conditional liberty

often results in probationers and persons on MSR having similar or even equal status *vis-à-vis* constitutional protections. For example, our supreme court "has stated generally that probationers and parolees share the same status for fourth amendment purposes." *Moss*, 217 Ill. 2d at 521-22. The First District, without deciding whether the statutes passed constitutional muster, previously recognized probationers and persons on MSR share a similar status for second amendment purposes. *People v. Garvin*, 2013 IL App (1st) 113095, ¶¶ 20-21, 994 N.E.2d 1076. Both probationers and persons on MSR are subject to many of the same restrictions on possessing firearms and ammunition. See 730 ILCS 5/5-6-3(a)(3) (West 2016) (mandating that probationers "refrain from possessing a firearm or other dangerous weapon where the offense is a felony or, if a misdemeanor, the offense involved the intentional or knowing infliction of bodily harm or threat of bodily harm"); 730 ILCS 5/5-6-3(a)(3) (West 2016) (mandating that parolees or persons on MSR "refrain from possessing a firearm or other dangerous weapon"). What's more, both probationers and persons on MSR have similar (if not coextensive) due process rights when charged with violating terms of their release or probation. See *People v. Crawford*, 85 Ill. App. 3d 366, 367, 406 N.E.2d 861, 862 (1980). Coupling this analysis with that of the supreme court in *Morger*, we come to the inescapable conclusion probationers and persons on MSR share the same status for purposes of this particular first amendment issue.

¶ 26                    D. Overbreadth and Intermediate Scrutiny

¶ 27            Finding the statutory probation condition overbroad and facially unconstitutional, the *Morger* court held a blanket restriction on accessing or using social networking websites violated a probationer's first amendment rights. Since we are faced with a nearly identical rendition of the probation provision considered in *Morger*, we follow the Illinois Supreme Court's reasoning and come to the same conclusion—subsection (a)(7.12) of section 3-3-7 of the Unified Code of

Corrections is overbroad and facially unconstitutional. Concerning overbreadth: by completely prohibiting access or use of social networking websites, twenty-first century quintessential fora, the statute " 'prohibits constitutionally protected activity as well as activity that may be prohibited without offending constitutional rights.' " *Morger*, 2019 IL 123643, ¶ 58 (quoting *Relerford*, 2017 IL 121094, ¶ 50). The statutory prohibition applies to a sex offender on MSR, even if he or she did not use a social networking website in committing the underlying offense. It prevents a person on MSR from accessing or using social media, which "offers 'relatively unlimited, low-cost capacity for communication of all kinds.' " *Packingham*, 582 U.S. at ___, 137 S. Ct. at 1732. Consequently, we deem the statutory MSR provision overbroad because " '[a] substantial number of [the statute's] applications are unconstitutional, judged in relation to [its] legitimate sweep.' " *Morger*, 2019 IL 123643, ¶ 58 (quoting *Clark*, 2014 IL 115776, ¶ 11).

¶ 28 For similar reasons, the statutory MSR provision fails intermediate scrutiny as well. The statute undoubtedly serves a substantial governmental interest—namely, foreclosing sex offenders on MSR from identifying or contacting victims through social networking websites. But the statutory MSR condition is not narrowly tailored. By imposing a blanket ban on all access and use of social media, now probably the most commonly used forum for gathering information and communicating ideas, even when social media played no part in the crime, this statute "unnecessarily sweeps within its purview those who never used the Internet—much less social media—to commit their offenses and who show no propensity to do so, as well as those whose Internet activities can be supervised and monitored by less restrictive means." *Morger*, 2019 IL 123643, ¶ 58. Just as the supreme court noted in *Morger* for probationers, persons on MSR may still be subject to more specific limitations placed on their Internet access or use, like preliminary approval from the parole officer, unannounced examinations of Internet use, or installing hardware

to monitor Internet use, all of which would serve a legitimate public interest without violating a person's first amendment rights.

¶ 29                            III. CONCLUSION

¶ 30        For the reasons stated, we find subsection (a)(7.12) of section 3-3-7 of the Unified Code of Corrections (730 ILCS 5/3-3-7(a)(7.12) (West 2016)) overbroad and facially unconstitutional. Consequently, we reverse, in part, the trial court's judgment and vacate the MSR provision prohibiting defendant from accessing or using social networking websites. We otherwise affirm the trial court's judgment as to issues not before us.

¶ 31        Affirmed in part and vacated in part.


¶ 32        JUSTICE TURNER, dissenting:

¶ 33        I respectfully dissent. The appeal in this case should be dismissed because the sole issue raised on appeal is not justiciable.

¶ 34        A basic tenet of justiciability provides the following:

            " '[r]eviewing courts will not decide moot or abstract questions or

            render advisory opinions. Courts of review ordinarily will not

            consider issues where they are not essential to the disposition of the

            cause or where the result will not be affected regardless of how the

            issues are decided.' " *People ex rel. Sklodowski v. State*, 162 Ill. 2d

            117, 130, 642 N.E.2d 1180, 1185 (1994) (quoting *Barth v. Reagan*,

            139 Ill. 2d 399, 419, 564 N.E.2d 1196, 1205 (1990)).

¶ 35        On appeal, defendant only challenges the constitutionality of section 3-3-7(a)(7.12) of the Unified Code of Corrections (730 ILCS 5/3-3-7(a)(7.12) (West 2016)).

¶ 36        Section 3-3-7 is contained in chapter three of article three of the Unified Code of

Corrections (730 ILCS 5/ch. III, art. III (West 2016)). Article 3 of the Unified Code of Corrections (730 ILCS 5/art. III (West 2016)) establishes the prisoner review board and grants it broad authority over the administration of MSR. *People v. McCurry*, 2011 IL App (1st) 093411, ¶ 18, 961 N.E.2d 900. Specifically, for those serving indeterminate supervised release terms pursuant to section 5-8-1(d)(4) of the Unified Code of Corrections (730 ILCS 5/5-8-1(d)(4) (West 2016)), the prisoner review board has the authority to decide the conditions of MSR and the time of discharge from MSR. *McCurry*, 2011 IL App (1st) 093411, ¶ 18. The actual imposition of the MSR term is a separate matter that is addressed in chapter five of the Unified Code of Corrections, which pertains to sentencing. MSR terms are mandated by the legislature, and the circuit courts are required to impose them. *McCurry*, 2011 IL App (1st) 093411, ¶ 26. Accordingly, section 3-3-7 is directed at the prisoner review board and not the circuit court or its sentencing judgment. Section 3-3-7 directs the prisoner review board to impose certain conditions on a defendant when he or she is released onto MSR, including the one at issue in this appeal. 730 ILCS 5/3-3-7(a)(7.12) (West 2016).

¶ 37        I do not dispute the prisoner review board would have to impose the MSR condition contained in section 3-3-7(a)(7.12) on defendant if he was released from prison on MSR in the near future. However, section 3-3-7(a)(7.12) is not a current condition imposed on defendant while he is in DOC, and defendant is not expected to be released on MSR until September 11, 2046, more than 25 years from now (see *Inmate Search*, Illinois Department of Corrections, http://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited Dec. 31, 2020) [https://perma.cc/CJU6-WP5B]). As such, defendant is not close to receiving his MSR conditions. See 730 ILCS 5/3-3-7(c) (West 2016) (requiring defendants to receive in writing the conditions under which the MSR terms must be served prior to his or her release onto MSR). The chance of

- 15 -

section 3-3-7(a)(7.12) being in existence in its current form when defendant is released onto MSR in more than 25 years is basically zero. I take judicial notice of the fact the prisoner review board has already modified its own mandatory supervised release/parole condition definitions in light of *Morger*. See *Country Companies v. Universal Underwriters Insurance Co.*, 343 Ill. App. 3d 224, 229, 796 N.E.2d 639, 643 (2003) (noting the reviewing court can take judicial notice of public records regardless of whether such records were before the trial court).

¶ 38        Given the virtual impossibility the prisoner review board will ever impose the MSR condition contained in section 3-3-7(a)(7.12) of the Unified Code of Corrections on defendant, finding the statute unconstitutional does not have any effect on defendant and is an abstract question in this case. As such, defendant's sole argument lacks justiciability, and the appeal should be dismissed.

**No. 4-18-0142**

| | |
|---|---|
| **Cite as:** | *People v. Galley*, 2020 IL App (4th) 180142 |
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, No. 17-CF-14; the Hon. Thomas E. Griffith Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |