2023 IL App (2d) 220034-U
No. 2-22-0034
Order filed February 8, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-675 |
| JOSHUA R. KREGER, | ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The evidence was sufficient to support defendant's convictions of two counts of predatory criminal sexual assault of a child based on contact between defendant's penis and the victim's mouth. Defendant's trial counsel was not ineffective at cross-examination or closing argument. Last, defendant did not present a justiciable challenge to a condition of mandatory supervised release for sex offenders. Therefore, we affirm.

¶ 2   Defendant, Joshua R. Kreger, appeals from his convictions of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. Defendant raises three arguments on appeal: (1) The evidence was insufficient to support his conviction of two counts of predatory criminal sexual assault of a child based on contact between defendant's penis and the mouth of

K.H., a minor under the age of 13; (2) his trial counsel was ineffective for eliciting testimony regarding penis-to-mouth contact during cross-examination and misstating the evidence of penis-to-mouth contact at closing argument; and (3) as an anticipated condition of his mandatory supervised release (MSR), his ban on accessing or using social networking websites would violate the first amendment of the United States and Illinois Constitutions. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was indicted on nine counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2018)).[1] Relevant to this appeal, counts V and VI both alleged predatory criminal sexual assault of a child occurring on or about June 1, 2017, to May 31, 2018, in that defendant, who was 17 years of age or older, knowingly committed an act of sexual penetration with K.H., who was under 13 years of age at the time, by placing his penis in K.H.'s mouth.

¶ 5     The case proceeded to a jury trial, and K.H. testified as follows. She was currently 13 years old and in 8th grade. She was living in McHenry and had previously lived in Algonquin and McCullom Lake. When she lived in Algonquin, she was in second and third grade and was about eight or nine years old. At the Algonquin home she lived with her aunt, her grandma, her mom, her brother and sister, and defendant and his son.

¶ 6     Defendant was her mother's boyfriend. When he first moved into the Algonquin home, she got along with him. But he then began to "touch [her] in weird ways," including rubbing himself against her. At first, he would rub himself against her when their clothes were on. He called this

_____

[1]Prior to trial, the State moved to dismiss two counts of aggravated criminal sexual abuse (counts X and XI), and the trial court granted the motion.

act the "squishy monster." Eventually, he rubbed himself against her while they were undressed. He would rub his penis against her vagina. This occurred in her mother's room at the Algonquin home, and nobody else was in the room when it would happen; the bedroom door was closed and locked. This occurred "almost every day," continuing from when she was in second grade through third grade. K.H. did not tell anyone what was happening because she was scared. Defendant had told her that if she told others about what he was doing, he would not be able to see his son anymore.

¶ 7    K.H. moved to McCullom Lake after she finished third grade. She moved with her mother, her siblings, and defendant. At the McCullom Lake house, defendant continued to rub his penis against her vagina "almost every day." Again, he would do this to her in her mother's bedroom. One time when defendant was rubbing her, it "felt like he was pushing" against her vagina and "[i]t hurt." She responded by kicking defendant. His penis had not entered her vagina. After she kicked him, he stepped away, she dressed, and she ran to her room.

¶ 8    Another time defendant put a condom on and asked her to suck his penis. She said no, but defendant put his penis in her mouth. This occurred one time at the McCullom Lake house. K.H. denied that this type of contact occurred elsewhere than the McCullom Lake house.

¶ 9    Defendant also made sexual contact with her while they were in his Chevrolet truck. He parked the truck, and she would be undressed either sitting on his lap or laying down. He would open the fly of his pants and rub his penis against her vagina. Afterward he would drive her to stores and buy her things. On direct examination, K.H. answered that this type of contact in the truck happened on two or three occasions. However, on cross-examination, she said it had happened once.

¶ 10    K.H. and her family moved again the next year, this time to a house in McHenry, which is where she went to school in fifth grade. Defendant did not move with them because her mother had broken up with him. After their breakup, K.H. did not continue to have contact with defendant. Nobody was touching her when she was in fifth grade, and fifth grade was fun.

¶ 11    After K.H.'s mother broke up with defendant, she began dating a new man, Jimmy. Jimmy eventually moved in with them. He would take them fishing and out to eat. Jimmy did not touch her in ways she did not want to be touched, and he was good with her mother. K.H. trusted him.

¶ 12    K.H. told Jimmy what defendant had done to her. He called her mother, and her mother came home from work. K.H. told her mother about what had happened with defendant, and her mother took her to the police station.

¶ 13    The police sent K.H. to the Child Advocacy Center (CAC), which she described as a place where "adults talk to you about sexual assault and stuff." K.H. remembered going to the CAC and speaking with someone there. Nobody told her what to say at the CAC.

¶ 14    Amy Bucci was a detective with the Algonquin Police Department. On August 16, 2019, she interviewed K.H. at the CAC. K.H. was 11 years old at the time, and nobody else was in the room with them. Her interview with K.H. was recorded, and the recording was played for the jury.

¶ 15    The relevant portions of the CAC recording were as follows. Bucci asked K.H. about defendant asking her to "let [him] finish," and K.H. related that defendant had "one time *** made me suck his thing." When Bucci asked her to tell her about that, K.H. responded that defendant put a condom on. When asked whether she had seen defendant put on a condom "at any other time," she responded yes, and then said, "I seen [*sic*] it like twice." To clarify, Bucci asked if she saw defendant put a condom on twice, "or you saw him twice something else?" K.H. answered that she "saw him put a condom on twice."

¶ 16    Later in the interview, Bucci asked K.H. about the "two times" that defendant put his penis by her mouth and where that occurred, and K.H. answered it was at the McCullom Lake house. She "remember[ed] the exact place" was her mother's room. K.H. did not confirm multiple instances of such contact at the McCullom Lake house, nor did she correct Bucci's characterization of such contact as occurring two times. K.H. later confirmed that defendant had rubbed his penis on her while they were in his vehicle.

¶ 17    Aiden H. was K.H.'s brother, he was 15 years old, and he testified as follows. Aiden did not spend much time with defendant when he was at home, but K.H. did. She and defendant were always playing games around the house. While living at the Algonquin house, he thought it was odd that every time he would go to get food or a drink after playing video games, K.H. and defendant would be in his mother's bedroom with the door locked. He knew it was usually locked because he had tried opening the door on several occasions. When it was unlocked, defendant would yell at him if he opened the door. Aiden would see K.H. laying on the bed, and defendant would be either by her or by the door.

¶ 18    Defendant and K.H. would be in the bedroom together most days after school. When he knocked on the door, defendant would say they were busy or planning something, such as a gift for him. Aiden never received a gift from defendant. Defendant also took K.H. with him when he bought cigarettes or snacks. Aiden did not go with defendant, but K.H. went "frequently." K.H. would return with candy and sometimes even toys. Defendant got toys for K.H. "very often," but defendant got toys for him and Savanna "rarely." When they moved to McCullom Lake, defendant continued to provide gifts to K.H. and to spend time with her alone in a locked room.

¶ 19    James Bay, who went by Jimmy, testified as follows. Jimmy had lived with K.H.'s mother, Amber Latzke, in McHenry in 2019 and 2020. Amber was his ex-girlfriend. Along with Amber,

Jimmy also had lived with Aiden and K.H.'s younger sister, Savanna. Jimmy and Amber's relationship ended on good terms, and he moved to Wisconsin after the breakup.

¶ 20     On August 13, 3019, Jimmy returned home from work around 3:15 p.m. K.H. and Aiden were arguing with each other, and he told them to "knock it off." He said if they needed to talk about something, "let's sit down here and let's talk about it." In response, K.H. said she had something she wanted to get off her chest. Aiden shrugged and went off toward his room.

¶ 21     Jimmy and K.H. sat on the couch, and she started to cry. He could tell she was in distress, and he told her that if something was bothering her, she could tell him about it. K.H. first responded that she could not tell him because it would make him and her mother mad. He continued that if something was bothering her, she had to tell him so that they could resolve the issue. At that point, K.H. started bawling, and was really in distress.

¶ 22     Jimmy began asking about people. He asked K.H. if it was something about her father, or if she had had a fight with Alexa, her best friend. She said no to both. He asked about Amber's ex-husband and about various cousins. He listed maybe seven or eight people, and then he asked if it had something to do with defendant. At first K.H. did not say anything; she just teared up and shook her head. He continued to ask about defendant, and she yelled in a sharp tone that defendant had touched her. He could tell she was very upset, and he called Amber. Amber came home and spoke with K.H., and afterward they all went to the police station.

¶ 23     Amber testified as follows. She began dating defendant in early 2016. Early on, the children and defendant seemed to get along; she did not have any concerns about his interactions with the children. At McCullom Lake, the only issue she had about defendant's interactions with her children was that he favored K.H. He took her to the store all the time and would buy her things, including clothes, toys, and candy. She asked defendant why he never took Aiden, and he

responded that Aiden never wanted to go. Defendant did not buy Aiden or Savanna gifts, and his disparate treatment of her children was an issue in their relationship.

¶ 24 During Amber's relationship with defendant, she suspected his infidelity with other women but could never prove it. There were two women with whom she suspected defendant was having an affair. She described her and defendant's relationship as "toxic." She ended the relationship in May 2018, and she began dating Jimmy in December 2018. After their breakup, defendant owed her around $3000 of back rent and bill payments, and he once brought some of the money owed to her at her new house.

¶ 25 On August 13, 2019, she was at work when she received a call from Jimmy, but she did not answer it. Then she received several calls from Aiden, so she answered, and he was crying hysterically. He said that defendant had hurt K.H. Amber left work and went home immediately. She spoke with K.H. about what happened, and K.H. told her about defendant's sexual conduct against her that occurred while Amber was dating him, starting with the "squishy monster" game.

¶ 26 Amber asked K.H. whether defendant ever made her do anything to him or whether he tried to put himself inside her. K.H. told Amber that defendant "used to make her suck his dick with a condom on in his truck when they'd go to the store to buy stuff." She also said that he tried to put himself inside her once, "but only a little bit went in."

¶ 27 On cross-examination, counsel asked Amber about her conversations with K.H. The following dialogue took place:

"[DEFENSE ATTORNEY]: And you said that she told you he would ask her to make her suck his dick when he took her to the store?

[AMBER]: Yep.

Q. And did she say how many times this happened?

A. No, she did not.

Q. But she said it happened multiple times?

A. She did.

Q. And she said it was always in his truck?

A. Well, that's what she said when he made her suck his dick was in the truck and that he would make her wear—make—he would wear a condom.

Q. So she didn't tell you this only happened one time?

A. No."

¶ 28 At the close of the State's case, defense counsel moved for a directed verdict, arguing that counts V and VI were duplicative in that both alleged that defendant placed his penis in K.H.'s mouth but K.H. testified that this act occurred only once. Counsel acknowledged Amber's conflicting testimony but stressed that K.H. was clear, both in her testimony and in the CAC interview, that this conduct happened only one time. The trial court denied the motion.

¶ 29 Defendant testified on his own behalf as follows. He was 35 years old and had been in a relationship with Amber beginning in 2016. He agreed with Amber's testimony that their relationship was "toxic." He explained that there were "always arguments about [his] son Levi and her kids. There was [*sic*] money situations. I cheated on Amber." He confirmed that he had had relationships with three other women while he was in a relationship with Amber. Following their breakup, he confirmed bringing her money that he owed her. When Amber wanted more money from him, he told her he did not have anymore, and he ended up getting a phone call from the police accusing him of vandalizing her mailbox. He denied damaging the mailbox and was never arrested for doing so.

¶ 30    Defendant described his relationship with both Aiden and K.H. as good. K.H. always wanted to be around him and go places with him. He denied ever taking K.H. into a bedroom and locking the door. He denied sexually assaulting or abusing her, including denying putting his penis in her mouth. Defendant acknowledged having driven K.H. in his truck to the park by herself. He did not keep condoms in his truck, but he did have a condom in his wallet.

¶ 31    The State argued in closing that the jury should find that defendant penetrated K.H.'s mouth with his penis "more than one time." The State argued that his penis "didn't have to go into her mouth. Him pressing his penis to her lips is enough. That's sexual penetration." The State continued that the jury knew this happened more than once because K.H. "talked about it on three different occasions." It continued that the jury "heard about it on the CAC video" and "heard about it from Amber" when she related in her testimony what K.H. had told her.

¶ 32    In the defense's closing, counsel argued that it was "illogical" for defendant, who allegedly had unfettered access to a bedroom with a lockable door, to take K.H. in his truck and "go to a park in broad daylight in front of God and everybody and take her clothes off." Counsel continued that the State alleged two counts of penis-to-mouth contact, and counsel recounted the evidence as follows:

> "[K.H.] says on the witness stand it happened once. [K.H.] says to the CAC interviewer it happened on more than one occasion. Now this is what her mother says. Her mother said, [K.H.] told me he would take her in the truck all the time and go to the store to buy things *** [and] said he would make her suck his dick all of the time. So why is [*sic*] there not 50 charges before you? Why is there not one? Why is [*sic*] there two? That's arbitrary because their own witnesses, they can't even get this straight as to what happened."

¶ 33    The jury found defendant guilty on all counts, including the two counts of predatory criminal sexual assault of a child for penis-to-mouth contact. Defendant was sentenced to 54 years' imprisonment on the 9 predatory criminal sexual assault charges (6 years per charge to be served consecutively at 85%) and 5 years' imprisonment for the 2 aggravated criminal sexual abuse charges (5 years per charge to be served consecutive to the predatory criminal sexual assault charges but concurrent to each other at 50%). The trial court estimated that, if defendant received the full credit permitted for his sentences, the total length of his incarceration would be 48.5 years. Defendant also received an MSR of three years to natural life on counts 1 through 9 and an MSR of 1 year on counts 12 and 13. The trial court explained that "mandatory supervised release is not controlled by the Court. It is currently controlled by the Illinois Prison [*sic*] Review Board, which means that on completion of the sentence, there will be terms that you may have to meet."

¶ 34    Defendant moved to reconsider his sentence, and the trial court denied the motion.

¶ 35    This timely appeal followed.

¶ 36                    II. ANALYSIS

¶ 37                    A. Sufficiency of the Evidence

¶ 38    Defendant argues that, with respect to counts V and VI for predatory criminal sexual assault of a child, the State failed to provide sufficient evidence of more than one instance where defendant placed his penis in K.H.'s mouth. He argues that during K.H.'s interview with Bucci at the CAC, K.H. told her that defendant had put his penis in her mouth one time at one location: her mother's bedroom at the McCullum Lake house. He argues that K.H.'s testimony at trial was consistent with her statements to Bucci at the CAC interview.

¶ 39    Turning to Amber's testimony that K.H. had told her of penis-to-mouth contact occurring in defendant's truck, defendant argues that Amber lacked credibility. He argues that her testimony

was hearsay, although he concedes it was properly admitted under a hearsay exception (725 ILCS 5/115-10 (2018)). He contends it was unreasonable to believe Amber's testimony over K.H.'s because Amber would have been emotional when K.H. told her about defendant's conduct and she was not present at any of the alleged offenses.

¶ 40  Defendant further argues that Amber had motive to lie or fabricate allegations against defendant. Defendant highlights that Amber described her relationship with defendant as "toxic," she believed that defendant owed her money, and when she believed he did not pay her all he owed, she called the police on defendant claiming he damaged her mailbox.

¶ 41  The State responds that the record supported a conviction on the two counts of predatory criminal sexual assault of a child. It argues that, in addition to K.H.'s testimony about penis-to-mouth contact occurring in the bedroom, Amber provided admissible testimony that defendant also put his penis in K.H.'s mouth while in his truck. As such, it concludes that the jury had sufficient evidence to find defendant guilty on both counts.

¶ 42  We agree with the State. On a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22. The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 43  We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19. The testimony of a single witness is

sufficient to convict where the testimony is positive and credible, even when contradicted by the defendant. *People v. Gray*, 2017 IL 120958, ¶ 36.

¶ 44    Here, the evidence was sufficient to convict defendant of two counts of predatory criminal sexual assault of a child based on him placing his penis in K.H.'s mouth. As relevant to this case, the offense of predatory criminal sexual assault of a child is committed when a person is at least 17 years old, the person commits an act of sexual penetration, and the victim is under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2018). "Sexual penetration" includes any contact, however slight, between the sex organ of one person and the mouth of another person. 720 ILCS 5/11-0.1 (West 2018).

¶ 45    Importantly, the jury heard testimony of at least two separate contacts between defendant's penis and K.H.'s mouth. One such instance was supported by K.H.'s trial testimony that, at the McCullom Lake house, defendant put his penis in her mouth. In addition, Amber related K.H.'s statement to her concerning sexual conduct that took place in defendant's truck. She testified at trial that K.H. told her that defendant had made her "suck his dick with a condom on in his truck when they'd go to the store to buy stuff." The trial court, after finding at a pre-trial hearing that the time, content, and circumstances of K.H.'s statement to Amber provided sufficient safeguards of reliability, admitted K.H.'s statement under the relevant hearsay exception (see 725 ILCS 5/115-10 (2018)), and defendant does not challenge the statement's admission.

¶ 46    Although defendant testified that these acts never took place and challenges the credibility of the witnesses, a conviction will not be reversed simply because the evidence is contradictory or a defendant contends a witness is not credible. *Gray*, 2017 IL 120958, ¶ 36. It was the jury's function to resolve inconsistencies in the evidence and assess the witnesses' credibility. *Id.* ¶ 35. The jury reasonably found defendant guilty of two counts of predatory criminal sexual assault for

penis-to-mouth contact because the jury heard positive testimony that such contact occurred in two separate places. The trial testimony was not "improbable, unconvincing [or] contrary to human experience" so as to create a reasonable doubt of defendant's guilt (*People v. Marion*, 2015 IL App (1st) 131011, ¶ 45), especially in light of defendant admitting that he drove K.H. in his truck alone and that he carried a condom in his wallet, K.H. testifying that sexual conduct occurred in both her mother's bedroom and defendant's truck, and Aiden corroborating K.H.'s testimony that defendant would lock himself and K.H. in Amber's room at the McCullom Lake home. Thus, viewing the record in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt all elements of predatory criminal sexual assault of a child on both counts V and VI.

¶ 47                               B. Ineffective Assistance

¶ 48    Defendant argues that, even if we find the evidence sufficient to convict of the two counts of predatory criminal sexual assault of a child, his trial counsel was ineffective in two ways. First, he argues that his trial counsel was ineffective on cross-examination when he questioned Amber about penis-to-mouth contact occurring in defendant's truck. He contends that it was only on cross-examination that Amber stated that such contact occurred multiple times, providing the jury evidence with which to convict defendant of multiple counts.

¶ 49    Defendant continues that his trial counsel was also ineffective during closing argument in that counsel erroneously told the jury that K.H. had told the CAC interviewer that defendant had placed his penis in her mouth on more than one occasion. He argues that this misstated the evidence because, during her CAC interview, K.H. had said such contact had occurred only once, taking place in Amber's bedroom. He concludes that this mistake in closing argument was not the product

of reasonable trial strategy and was prejudicial in that it allowed the jury to convict defendant of two counts related to penis-to-mouth contact instead of one.

¶ 50    The State responds that defendant's argument ignores the entirety of the evidence presented against him. Specifically, it contends that the evidence supported conviction of two counts of predatory criminal sexual assault of a child because the jury heard testimony that penis-to-mouth contact occurred twice and at two separate locations, and therefore neither defense counsel's cross-examination nor closing argument prejudiced defendant.

¶ 51    We agree again with the State. To show ineffective assistance, defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Dupree*, 2018 IL 122307, ¶ 44. The two prongs that defendant must show are that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) he was prejudiced by his counsel's deficient performance. *Id.*

¶ 52    To establish deficient performance, defendant must show that his trial counsel was not functioning as the counsel guaranteed by the Sixth Amendment and must overcome the strong presumption that counsel's performance was the product of sound trial strategy. *Id.* To establish prejudice, he must show that, but for his trial counsel's deficient performance, there was a reasonable probability that the result of the proceeding would have been different—that is, his counsel's deficient performance was so serious that it deprived him of a fair trial. *Id.*

¶ 53    Here, defendant cannot show either prong of an ineffective-assistance claim. First, defense counsel's performance, both at his cross-examination of Amber and during his closing argument, was the product of reasonable trial strategy. To wit, counsel sought to attack the credibility of Amber and K.H. by emphasizing the conflicting nature of the evidence. During closing argument, counsel specifically contrasted K.H.'s trial testimony (penis-to-mouth contact occurred once) with

her CAC interview (it happened more than once) and Amber's trial testimony (it happened regularly in defendant's truck). Defendant rhetorically asked why there were not 50 counts, or only 1 count, and asserted the answer was that the charges were arbitrary because the State's witnesses could not get their stories straight.

¶ 54    Although defendant argues that it was error specifically for counsel to characterize K.H.'s CAC interview as supporting more than one instance of penis-to-mouth contact, the CAC interview is at best unclear about whether such contact occurred only once. K.H. never corrected Bucci's implication of two instances of penis-to-mouth contact, and K.H.'s answer that she twice saw defendant put on a condom did not rule out defendant placing his penis in her mouth more than once, especially in light of both K.H. and Amber testifying at trial that defendant had put a condom on when he asked K.H. to suck his penis. Further, K.H.'s only affirmative statement supporting one instance of penis-to-mouth contact was that defendant "one time ** made me suck his thing." As noted *supra* ¶ 44, "sexual penetration" occurs with any contact, however slight, between mouth and penis. Therefore, even if defendant made K.H. "suck" his penis once, that did not preclude defendant sexually penetrating her another time by simply placing his penis on or in her mouth. Considering that counsel's strategy during closing argument was to highlight conflicts in the evidence, counsel's inference from the CAC interview of multiple instances of penis-to-mouth contact was not error but instead was consistent with his strategy.

¶ 55    Also consistent with counsel's strategy, his cross-examination challenged the reliability of Amber's testimony, having her confirm that K.H. had not specified the number of times defendant had asked her to suck his penis in his truck. His cross-examination further sought to highlight the conflicting nature of the evidence by asking whether defendant *always* asked K.H. to suck his

penis in his truck. Amber answered that K.H. said this conduct occurred in his truck and that he would wear a condom.

¶ 56    Moreover, counsel's performance did not prejudice defendant. As explained in our resolution of the sufficiency of the evidence issue, the jury heard testimony from K.H. that penis-to-mouth contact occurred in Amber's bedroom, and it also heard testimony from Amber that penis-to-mouth contact occurred in defendant's truck. This was sufficient evidence to support two separate counts of predatory criminal sexual assault of a child. Therefore, there is no reasonable probability that the jury would have convicted defendant of less than two counts of predatory criminal sexual assault of a child had defendant declined to cross-examine Amber on the matter or refrained during closing from contrasting K.H.'s CAC interview with the testimony at trial.

¶ 57                              C. Condition of MSR

¶ 58    Last, defendant challenges the constitutionality of the MSR condition provided under section 3-3-7(a)(7.12) of the Unified Code of Corrections (Code) (730 ILCS 5/3-3-7(a)(7.12) (West 2020)) as violating his right to free speech under the First Amendment. He argues that the section, which would provide that he "refrain from accessing or using a social networking website" (*id.*), is unconstitutional both because it is overly broad and because it fails the intermediate scrutiny standard applicable to content-neutral restrictions on Internet speech. He urges us to follow the holdings of our supreme court in *People v. Morger*, 2019 IL 123643, and the Fourth District in *People v. Galley*, 2021 IL App (4th) 180142, and to vacate his MSR condition because it is unconstitutional.

¶ 59    The State responds that defendant's constitutional challenge to his MSR condition is not justiciable. It contends that the constitutionality of section 3-3-7(a)(7.12) of the Code (730 ILCS 5/3-3-8(a)(7.12) (2020)) presents a moot or abstract question in that the MSR condition can never

be applied to defendant. In addition, the State urges us to follow the dissent in *Galley* (2021 IL App (4th) 180142, ¶¶ 32-38 (Turner, J., dissenting)), which reasoned that the MSR condition was not justiciable because of the "virtual impossibility" that it would ever be imposed on the defendant.

¶ 60    We conclude that defendant's challenge to section 3-3-7(a)(7.12) of the Code (730 ILCS 5/3-3-8(a)(7.12) (2020)) does not present a justiciable dispute because the specific constitutional issue presented has already been resolved. The overarching purpose of the justiciability doctrine is to "reserve the exercise of judicial authority for situations where an actual controversy exists." *Ferguson v. Patton*, 2013 IL 112488, ¶ 23. An "actual" controversy requires that the underlying facts and issues of a case be neither moot nor premature, so that the court does not pass judgment on mere abstract propositions of law, render advisory opinions, or give legal advice as to future events. *Id.* For reviewing courts, it is a basic tenet of justiciability to not decide moot questions. *In re J.T.*, 221 Ill. 2d 338, 349 (2006). An appeal is considered moot where it presents no actual controversy. *Id.*

¶ 61    Here, the trial court did not set the conditions of defendant's MSR; it set only the duration of the MSR terms. See *People v. McCurry*, 2011 IL App (1st) 093411, ¶¶ 16-17 (MSR terms, whether set for a number of years or indeterminate, are mandated by statute and must be imposed at sentencing). This is because setting the conditions of MSR is not the purview of the circuit courts but instead is that of the Prisoner Review Board. See 730 ILCS 5/3-3-1(a)(5) (providing that the Prisoner Review Board shall have the authority to set conditions of MSR); *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 20 (explaining section 3-3-1(a)(5) of the Code). Although we recognize that the statutory conditions provided under section 3-3-7(a) of the Code are mandatory conditions of MSR (see *Cordrey*, 2014 IL 117155, ¶ 21), none of those conditions

have yet been imposed on defendant, whose sentence rendered in December 2021 is estimated to require 48.5 years' imprisonment.

¶ 62    To the extent that defendant anticipates future harm, section 3-3-7(a)(7.12) of the Code has already been held unconstitutional. *Galley*, 2021 IL App (4th) 180142, ¶¶ 27-28. Therefore, there is no reasonable expectation that the Prisoner Review Board would impose the unconstitutional MSR condition on defendant, even if the current section 3-3-7(a)(7.12) were to remain a listed statutory condition at the time of defendant's hypothetical release. *Cf. People v. Younger*, 2015 IL App (1st) 130540-U, ¶ 21 (finding justiciable a challenge to the defendant's mandatory MSR condition to be electronically monitored where the court anticipated that the defendant would be subject to the condition upon release).

¶ 63    In short, defendant asks us to hold unconstitutional a statutory provision that has already been held unconstitutional in order to vacate a condition of his MSR that has yet to be imposed and likely never will be imposed. This simply does not present an actual controversy. Defendant's anticipated future controversy has already been resolved and is therefore rendered moot by the holding in *Galley*, 2021 IL App (4th) 180142, ¶¶ 27-28, where the majority's reasoning rests soundly on our supreme court's holding in *Morger*, 2019 IL 123643, ¶ 58 (holding that section 5-6-3(a)(8.9) of the Code's condition of probation to "refrain from accessing or  using a social networking website" was facially unconstitutional under the First Amendment). Bolstering our holding, we believe it would be imprudent and inefficient for this court to revisit this same constitutional issue every time a defendant is convicted of a sex offense.

¶ 64                               III. CONCLUSION

¶ 65    For the reasons stated, we affirm the judgment of the McHenry County Circuit Court.

¶ 66    Affirmed.